IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

JEANETTE L. RIDDLE,                )
                                   )
                Plaintiff,         )
                                   )
        v.                         )        Case No.
                                   )        12-3292-CV-S-REL-SSA
CAROLYN W. COLVIN, Acting          )
Commissioner of Social Security,   )
                                   )
                Defendant.         )

**ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Jeanette Riddle seeks review of the final decision of the Commissioner

of Social Security denying plaintiff's application for disability benefits under Titles II and

XVI of the Social Security Act ("the Act").  Plaintiff argues that the ALJ erred in failing to

give controlling weight to the opinion of Kyle P. Smith, D.O., plaintiff's treating physician

and instead giving more weight to the opinions of Charles Ash, M.D., and David Lutz,

Ph.D., who are one-time examiners.  I find that the substantial evidence in the record as

a whole supports the ALJ's finding that plaintiff is not disabled.  Therefore, plaintiff's

motion for summary judgment will be denied and the decision of the Commissioner will

be affirmed.

## *I.    BACKGROUND*

On April 28, 2008, plaintiff applied for disability benefits alleging that she had

been disabled since July 30, 2007.  Plaintiff's disability stems from arthritis in her back

and knees.  Plaintiff's application was denied on June 16, 2008.  On December 1,

2009, a hearing was held before an Administrative Law Judge.  On July 16, 2010, the

ALJ found that plaintiff was not under a "disability" as defined in the Act.  On April 17,

2012, after considering additional evidence, the Appeals Council denied plaintiff's request for review. Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II. STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner. The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996). The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989). "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991). However, the substantial evidence standard presupposes a zone of

choice within which the decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

### III. BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations are codified at 20 C.F.R. §§ 404.1501, et seq. The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1.      Is the claimant performing substantial gainful activity?

        Yes = not disabled.
        No = go to next step.

2. Does the claimant have a severe impairment or a combination of impairments which significantly limits his ability to do basic work activities?

> No = not disabled.
> Yes = go to next step.

3. Does the impairment meet or equal a listed impairment in Appendix 1?

> Yes = disabled.
> No = go to next step.

4. Does the impairment prevent the claimant from doing past relevant work?

> No = not disabled.
> Yes = go to next step where burden shifts to Commissioner.

5. Does the impairment prevent the claimant from doing any other work?

> Yes = disabled.
> No = not disabled.

## IV.    THE RECORD

The record consists of the testimony of plaintiff and vocational expert Steven Benjamin, in addition to documentary evidence admitted at the hearing.  Because plaintiff's sole argument is whether the Medical Source Statements of Kyle Smith, D.O., are worthy of controlling weight, I will set out the findings in those opinions here:

On February 19, 2009, Dr. Smith found that plaintiff could lift 10 pounds occasionally and less than 10 pounds frequently, stand or walk for less than 2 hours per day, sit for less than 6 hours per day, and was limited in her ability to push or pull with her lower extremities (Tr. at 315-316).  He found that she could occasionally balance, reach in all directions, handle, and finger.  He found that she could never climb, stoop, kneel, crouch, or crawl; that she would need to avoid concentrated exposure to extreme

heat and noise; avoid moderate exposure to extreme cold wetness, humidity, vibration, fumes, odors, gases, and poor ventilation; and that she should avoid all exposure to machinery and dangerous heights. In support he wrote only the following: "Extreme weather/esp. cold, worsens pain. Side effects from some of her pain meds affects [sic] her ability."

On November 30, 2009, Dr. Smith completed a Medical Source Statement Mental (Tr. at 368-369). He found that plaintiff was not significantly limited in the following:

- The ability to remember locations and work-like procedures

- The ability to carry out very short and simple instructions

- The ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances

- The ability to sustain an ordinary routine without special supervision

- The ability to make simple work-related decisions

- The ability to ask simple questions or request assistance

- The ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness

- The ability to set realistic goals or make plans independently of others

He found that plaintiff is moderately limited in the following:

- The ability to understand and remember very short and simple instructions

- The ability to understand and remember detailed instructions

- The ability to carry out detailed instructions

- The ability to maintain attention and concentration for extended periods

- The ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods

- The ability to accept instructions and respond appropriately to criticism from supervisors

- The ability to be aware of normal hazards and take appropriate precautions

He found that plaintiff is markedly limited in the following:

- The ability to work in coordination with or proximity to others without being distracted by them

- The ability to interact appropriately with the general public

- The ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes

- The ability to respond appropriately to changes in the work setting

- The ability to travel in unfamiliar places or use public transportation

He found that plaintiff would not have the ability to understand, remember and carry out simple instructions for 8 hours a day, 5 days a week.  She would not have the ability to make judgments that are commensurate with the functions of unskilled work, i.e., simple work-related decisions, for 8 hours a day, 5 days a week.  He found that she would not be able to respond appropriately to supervision, co-workers, and usual work situations 8 hours a day, 5 days a week.  He found that she would not be able to deal with changes in a routine work setting 8 hours a day, 5 days a week.

## A. ADMINISTRATIVE REPORTS

The record contains the following administrative reports:

**Earnings Record**

The record shows that plaintiff earned the following income from 1989 through 2009:

| Year | Earnings | Year | Earnings |
|------|----------|------|----------|
| 1989 | $ 769.12 | 2000 | $ 4,912.87 |
| 1990 | 2,397.41 | 2001 | 3,820.77 |
| 1991 | 4,062.24 | 2002 | 48.00 |
| 1992 | 2,841.26 | 2003 | 5,135.00 |
| 1993 | 2,052.92 | 2004 | 4,266.03 |
| 1994 | 40.00 | 2005 | 7,560.34 |
| 1995 | 684.59 | 2006 | 8,403.00 |
| 1996 | 4,485.50 | 2007 | 5,658.50 |
| 1997 | 7,593.50 | 2008 | 152.69 |
| 1998 | 6,595.91 | 2009 | 0.00 |
| 1999 | 720.93 | | |

(Tr. at 154).

**Disability Report**

Plaintiff reported that she has a medical assistance card (Tr. at 156). She is unable to work due to arthritis in her knees and lower back, degenerative disc disease, and spinal stenosis (Tr. at 157). She indicated that she cannot concentrate due to pain (Tr. at 157).

**Missouri Supplemental Questionnaire**

Plaintiff cares for her two daughters, ages 18 and 11, as well as two dogs (Tr. at 180). She cooks for her family, she does dishes, makes beds, irons, takes out the trash, gardens, goes to the post office and does her own banking (Tr. at 180-181). Plaintiff

reads books and watches television (Tr. at 183). On an average day, she gets her daughter off to school, does housework, and then spends her day watching television and reading until dinner time (Tr. at 183). "Watching TV" takes up most of her day (Tr. at 183). She can watch a 2-hour movie and her only difficulty with that is sitting for too long (Tr. at 183). She had no difficulty reading books, newspapers and magazines (Tr. at 183). She goes to the library once a week for a one-hour computer session (Tr. at 183). Plaintiff is able to drive, she drives 2 to 3 times a week, and no one has advised her not to drive (Tr. at 184). She has no difficulty leaving her home, no problem following instructions, no problems getting along with others (Tr. at 184-185).

**B.    SUMMARY OF MEDICAL RECORDS**

On May 26, 2006, plaintiff saw Dr. Mark Coburn at St. John's Regional Health Center and underwent an MRI of the lumbar spine due to complaints of back pain (Tr. at 356-357). The findings indicated mild multilevel degenerative changes but no disc herniation or significant spinal stenosis.

On October 9, 2006, plaintiff saw Curtis C. Evenson, M.D., at St. John's Regional Health Center Pain Management Center (Tr. at 291-292). Dr. Evenson noted plaintiff's history of back pain dating back to the birth of her first child, better when she is up standing or walking. "She has been on some hydrocodone recently with modest improvement." (Tr. at 291). Plaintiff said she does some walking but did not have a regular exercise program. Plaintiff was smoking a pack of cigarettes per day. Plaintiff complained of pain after bending forward about half way but was able to stand back up. She complained of pain with bending backwards. She had some sacroiliac tenderness

and mild midline tenderness.  Her hips and knees moved well and she was able to ambulate.  Straight leg raising was negative.  Dr. Evenson reviewed plaintiff's MRI and assessed chronic low back pain, lumbar degenerative disc disease, and probable disorder of the sacrum along with tobacco abuse.  "I have discussed treatment with her. Foremost, she needs to consider having a regular exercise program and then also smoking cessation would help, at least as far as progression of her problems."  Dr. Evenson noted that plaintiff had chronic axial back pain but the source of that pain was "undetermined."  Dr. Evenson recommended epidural injections.  He indicated that if plaintiff's problem is from a degenerative disc, then the injections would not help.  He prescribed Chantix to help her stop smoking.

On October 12, 2006, Dr. Evenson administered a sacroiliac joint injection. (Tr. at 289).  "We will see her back in the office in a month. She is still working on getting her medication for smoking cessation.  I have told her to continue with her exercise."

On November 8, 2006, plaintiff saw Ms. Carrie Ossier, a nurse practitioner at St. John's (Tr. at 284-285).  Plaintiff reported that her pain had increased since her injection on October 12, 2006.  "She is taking hydrocodone for the pain. She does state that she is having to take two every three hours at times.  I have instructed her that this is above the prescription and the problem with long-term narcotic therapy is that the narcotics stop providing her with pain relief after a while as she is experiencing.  I have educated her that is [why] we try and find other forms of pain management. . . .  I have again educated smoking cessation, and have again educated the importance of an exercise program."  Ms. Ossier discussed plaintiff's lack of pain relief with Dr. Evenson.

"He does feel that her best option is to quit smoking and to practice diligent lumbar stabilization and lumbar strengthening exercises." Plaintiff rated her pain a 4 out of 10 at best, a 10 out of 10 at worst. Ms. Ossier observed that plaintiff's gait was normal and she had no muscle wasting in her extremities. Her sacroiliac joints were tender to palpation. Dr. Evenson refilled plaintiff's Norco (narcotic) and Soma (muscle relaxer) and referred her back to her primary care physician. "We have again educated the importance of smoking cessation and also the importance of lumbar strengthening and lumbar stabilization."

On January 10, 2007, plaintiff called the office of Kyle P. Smith, D.O., at St. John's Clinic (Tr. at 307). She asked for a refill of OxyContin. The note says that this was her last refill of OxyContin. Underlined was the phrase, "Need Follow Up Appointment!"

On January 25, 2007, plaintiff saw Dr. Smith (Tr. at 306). Plaintiff had been taking four muscle relaxers (Soma) per day instead of the three times a day as prescribed. "She does report the OxyContin is working well except for just a couple hours in between doses when she will feel some increased pain but is, otherwise, doing quite well." Plaintiff was there for a fasting recheck on her cholesterol. She indicated that she had not been taking her Lipitor in the past few months. On exam her lumbar area was "less tender than previous." He refilled her Soma.

July 30, 2007, is plaintiff's alleged onset date.

On November 2, 2007, plaintiff saw Dr. Patterson at CoxHealth Emergency Services due to menstrual cramping and lower back pain. (Tr. at 329). Plaintiff reported

that she was not on any medications.  Plaintiff reported no musculoskeletal complaints and no respiratory complaints.  She was listed as a smoker.  On exam her back was normal, her extremities were normal, her entire psychological exam was normal.  She was given a muscle relaxer and anti-inflammatory intramuscularly and Percocet (narcotic).  She was given prescriptions for Percocet and Ibuprofen.

On January 21, 2008, plaintiff saw Dr. Smith for a follow-up appointment (Tr. at 299).  "She says her back is doing well, but she has been having a little more pain in her knee.  Also, she has been having these panic attacks. Her fiancé may be going to prison, and she has been having these panic attacks where she gets short of breath and chest pain." On exam, Dr. Smith noted that plaintiff's left knee revealed some pain but no swelling or erythema. She still had pain in the lower back region.  He assessed chronic low back pain, left knee pain, and panic attacks.  He refilled plaintiff's OxyContin and prescribed Xanax, 0.5 mg, which treats anxiety.  A week later, plaintiff called Dr. Smith's office and said she had to take two Xanax tablets for an anxiety attack, and he increased her prescription to 1 mg. (Tr. at 299).  On February 22, 2008, Dr. Smith called in a refill for OxyContin (Tr. at 298).

On March 25, 2008, plaintiff saw Dr. Smith for a recheck on cholesterol (Tr. at 297).  "She also reports she has been having still some low back pain and knee pain, it is just not controlled with OxyContin 20 mg twice a day.  We talked about increasing her medication.  She continues to have anxiety attacks off and on."  Dr. Smith examined plaintiff and noted that she still had pain in the lower lumbar spine.  "Her knee pain is just kind of generalized."  He found no abnormalities on exam.  He increased her

OxyContin to 30 mg twice a day and refilled her Xanax.

On April 25, 2008, plaintiff saw Dr. Smith for a follow up (Tr. at 296). Plaintiff complained of continued back pain despite the recent increase in her dosage of OxyContin. "She has been on OxyContin 30 mg twice a day but we talked about increasing it up to 40. We also talked about her work status. She has tried to maintain a job and just been unable to because of the persistence of having to be on her feet and increasing back pain throughout the day and was just unable to hold a job. She does have some arthritic and degenerative changes in her back from previous MRI. Therefore, I did fill out a paperwork. I think she is trying to get herself covered for disability." On exam Dr. Smith noted low back pain with palpation, minimal generalized joint pain in the knees with no other abnormality. He increased her OxyContin and her cholesterol medication.

Three days later, on April 28, 2008, plaintiff applied for disability benefits.

On May 23, 2008, plaintiff saw Dr. Smith complaining of "chronic pain for many years." (Tr. at 293). Dr. Smith noted that plaintiff had been taking her medication without problems. "I have stressed the importance of taking her medication only as instructed." Plaintiff appeared to be in mild to moderate pain. She had some local tenderness in her lumbosacral spine are and "painful and reduced" lumbosacral range of motion but negative straight leg raising. Her strength was normal, heel and toe gait was normal. She had some generalized pain in the knee joint. She was assessed with chronic pain syndrome. Dr. Smith refilled plaintiff medications but noted, "Patient understands I will not be willing to refill controlled substances early."

On June 16, 2008, plaintiff's application for disability benefits was denied.

On Sunday, July 20, 2008, plaintiff saw Bernard Kennetz, M.D., at CoxHealth Emergency Services for low back pain "after riding rides at fair on Thursday night, radiation of pain to left shoulder" (Tr. at 332-337). The nurse triage sheet indicates that plaintiff was on no medication, and that was referred to by Dr. Kennetz in his record. Plaintiff was reported to be a smoker, she was fully oriented and cooperative. Her range of motion was normal. "States has back problems 'anyway' but states increased back pain after riding carnival rides." Plaintiff denied shortness of breath. Plaintiff denied all medical history other than chronic back pain. She had full range of motion in all of her extremities and 5/5 strength in all groups. Plaintiff had x-rays of her lumbar spine taken, and the doctor reviewed her MRI from 2003. "No acute changes, just chronic degenerative disc disease." Plaintiff was given an intramuscular injection of Toradol and was instructed to use over-the-counter pain medications. "She will be given Lorcet Plus [narcotic] to use only as an adjunct to that. She will also be placed on Robaxin as a muscle relaxer."

On August 13, 2008, plaintiff saw Joan Tomanek, M.D., at St. John's Imaging for an MRI of her left knee which showed chondromalacia[1] of her patella and no clear meniscal pathology (Tr. at 320, 360-361).

---

[1]"The cartilage under your kneecap is a natural shock absorber. Overuse, injury or other factors may lead to a condition known as chondromalacia patella -- a general term indicating damage to the cartilage under your kneecap. The most common symptom is knee pain that increases when you walk up or down stairs. Simple treatments -- such as rest and ice -- often help, but sometimes physical therapy or even surgery is needed to ease patellofemoral pain."
http://www.mayoclinic.com/health/chondromalacia-patella/DS00777

On September 12, 2008, plaintiff saw Richard Swinney, M.D., at CoxHealth Emergency Room for wheezing (Tr. at 338-340). Plaintiff continued to smoke. Her extremities were non-tender with normal range of motion. She was oriented times three but had a depressed affect. Plaintiff was assessed with bronchitis and chest wall pain. She was prescribed Doxycycline (antibiotic) and Lortab (narcotic) and told to stop smoking.

On October 20, 2008, plaintiff saw Victor Wilson, M.D., at St. John's Clinic for pain in her left knee (Tr. at 320). Plaintiff reported having had a steroid injection on September 23, 2008, but was still in a lot of pain. Dr. Wilson reviewed plaintiff's knee MRI from August 13, 2008. "The patient rarely exercises. She smokes 1 pack of cigarettes a day. . . . She is currently not working. She is single with two children." Under a review of symptoms, plaintiff reported no psychiatric symptoms. Her psychological exam was normal. She had full symmetric range of motion. She had some tenderness and mild crepitus (crackling sound in the joint) with active flexion and extension. X-rays were taken of her knee. Dr. Wilson assessed chondromalacia of her patella (which is the diagnosis on the MRI). Dr. Wilson performed viscosupplementation.[2]

---

[2]In its early stages, arthritis of the knee is treated with nonsurgical methods. Some of the more common options include changes in activity level, pain relievers such as ibuprofen or nonsteroidal anti-inflammatory drugs, along with physical therapy, and corticosteroid injections. Another treatment option is a procedure called viscosupplementation. In this procedure, a thick fluid called hyaluronic acid is injected into the knee joint. Hyaluronic acid is a naturally occurring substance found in the synovial (joint) fluid. It acts as a lubricant to enable bones to move smoothly over each other and as a shock absorber for joint loads.

On October 27, 2008, plaintiff saw Dr. Wilson at St. John's Clinic for her second Hyalgan injection. (Tr. at 323). She had no new complaints.

On November 4, 2008, plaintiff had her third Hyalgan injection in the left knee (Tr. at 324). "She has noticed no improvements to date."

On November 11, 2008, plaintiff had her fourth Hyalgan injection (Tr. at 325). "It is actually starting to feel better. She has started to do some of her home exercises."

On November 17, 2008, plaintiff had her fifth Hyalgan injection (Tr. at 326). "She is very happy with her knee at this point."

On December 28, 2008, plaintiff saw Dr. Kennetz at CoxHealth Emergency Services/Urgent Care for an upper respiratory injection (Tr. at 345-347). She continued to smoke. On exam her extremities were non-tender with normal range of motion. Her psychological examination was normal.

On February 19, 2009, Dr. Smith completed the Medical Source Statement Physical outlined above (Tr. at 315-316).

On February 25, 2009, plaintiff had an MRI of her back which showed stable mild L2-L3 and L5-S1 disc bulges. She had mild progression of the L3-L4 and L4-L5 degenerative disc disease/bulge.

On November 30, 2009, Dr. Smith completed the Medical Source Statement Mental which is outlined above -- this was a year and a half after her last visit with him (Tr. at 368-369). The following day was plaintiff's administrative hearing.

On December 18, 2009, plaintiff saw Dr. Smith for a follow up -- this was more than a year and a half after her last appointment with him (Tr. at 409). She reported

that she would sleep for two hours and then wake up.  Her anxiety was "fairly stable."

She had no medical side effects.  Her blood pressure was noted to be well controlled.

She had no new concerns.  Her knees were better.  She was able to complete her

activities of daily living with medication.  "Current treatment plan is effective, no change

in therapy."

On December 29, 2009, plaintiff saw David Lutz, Ph.D., for a consultative exam

at the request of the ALJ (Tr. at 373-385).  Dr. Lutz performed a mental status exam,

Wechsler Memory Scale-III, and  Minnesota Multiphasic Personality Inventory-2-RF.

He also reviewed her medical records from St. John's Clinic and from St. John's Health

System.  Plaintiff said her daily activities included getting her daughter off to school,

watching the news, doing household chores, walking her dog, and drinking one to two

liters of caffeinated beverages daily which she found interfered with her sleep.  She did

some cooking, watched television and read books. She can shop for herself but needs

some help with the lifting.  Trazodone had helped substantially and she had been able

to sleep through the night.  "She said that she was sleeping two to four hours during the

day to make up for the missed sleep at night until she was placed on trazodone about a

week before this interview."  Plaintiff understood the instructions on all of the tests and

said she had never been given such a test previously.  Dr. Lutz assess social phobia

based on plaintiff's description of having social anxiety in multiple situations.  "Her

caffeine usage may heighten her anxiety."  She had a GAF of 60.  Dr. Lutz found that

plaintiff had no difficulty understanding, remembering or carrying out instructions.  She

had mild limitations in her ability to interact appropriately with the public with

supervisors, and with co-workers. She had no difficulty responding appropriately to usual work situations and to changes in a routine work setting.

On January 4, 2010, plaintiff saw Charles Ash, M.D., for a consultative evaluation at the request of the ALJ (Tr. at 388-395). Plaintiff continued to smoke. Plaintiff was described as muscular and moving about satisfactorily without limp or list. She was able to walk on toes and heels satisfactorily. She had normal lateral bending and rotation in her back, but limited flexion and extension (bending forward and backward). She could bend forward 45 degrees (normal is 90). She had normal range of motion in her upper and lower extremities. Dr. Ash found that plaintiff could lift up to 20 pounds occasionally and 10 pounds frequently. He found that she could sit, stand and walk for one hour each at a time; that she could sit for up to 8 hours per workday stand for 2 hours per workday, and walk for 2 hours per workday. He found that she could frequently reach, handle, finger, and feel. She could occasionally climb, balance, stoop, kneel, crouch or crawl.

On March 13, 2010, plaintiff saw Dr. Smith for a follow up (Tr. at 432-433). Plaintiff denied medication side effects. Plaintiff had moderate tenderness but no spasm in her lumbosacral spine. Painful and reduced range of motion were noted, but no measurements were provided. Plaintiff continued to smoke. "Current treatment plan is effective, no change in therapy." Despite that comment, he added Naprosyn, which is a non-steroidal anti-inflammatory available over-the-counter.

## C.  SUMMARY OF TESTIMONY

During the December 1, 2009, hearing, plaintiff testified; and Steve Benjamin, a vocational expert, testified at the request of the ALJ.

## 1.  Plaintiff's testimony.

At the time of the hearing, plaintiff was 39 years of age (Tr. at 36).  She completed 11th grade and did not get a GED (Tr. at 36).  Plaintiff's alleged onset date is July 30, 2007 (Tr. at 36). At that time she was working part time but when she got home from work she would feel like she had worked 10 hours (Tr. at 36).  Plaintiff panicked and had trouble paying attention when she drove, and she had to lie down when she got home from work (Tr. at 37).  Plaintiff was working 20 hours a week performing in-home healthcare (Tr. at 37).  Plaintiff had to drive a woman to doctor appointments and she had to clean the woman's house (Tr. at 37).  Plaintiff vacuumed and dusted -- pushing and pulling became a problem and reaching became a problem (Tr. at 37-38). Bending over was out of the question (Tr. at 38).  So plaintiff quit that job (Tr. at 38).

Since then plaintiff worked at a glue factory for two or three days in January 2003 (Tr. at 38). She had been hired to work full time, but she could not do it (Tr. at 38).  She quit because of her medical problems (Tr. at 38).  Even though plaintiff knew she was disabled, she tried to work because she was frustrated at not being able to make money for her family (Tr. at 39).  Her fiancé was only doing seasonal work so she felt like she had to try to earn some money (Tr. at 39).

Dr. Smith is plaintiff's primary care doctor (Tr. at 39).  He prescribes medication for her pain (Tr. at 39).  Plaintiff had injections in her knee done by Dr. Wilson, an

orthopedic doctor, and that helped her knee (Tr. at 40).  Her knee was okay for quite a while (about six months) but a month before the hearing it started bothering her so she had a cortisone injection then (Tr. at 40).  Since she had cortisone shots, her knee pain has been tolerable (Tr. at 41).  As long as she is sitting her knee is okay (Tr. at 41).  The more plaintiff uses her knee or her back, the more it hurts, no matter how much medication she takes (Tr. at 41).  Plaintiff began taking Soma and Hydrocodone in 2001 but now also takes OxyContin (Tr. at 42).  Plaintiff has a hard time focusing and concentrating sometimes because of her medication, and she takes a nap for two to four hours every day (Tr. at 44).  She has been on her medication for the past four years, but her naps just started in the last couple of months (Tr. at 44).  She is up and down all night so has trouble sleeping (Tr. at 44).  When asked what it is that has her up and down at night, she said, "I don't know.  I can fall asleep.  I don't have any problem falling asleep.  It's staying asleep.  I sleep for about two hours, and then I'm up. I believe it has to do with laying in the bed with my back because it's usually my back is what's troubling me." (Tr. at 44).

Pain shoots down the right side of her leg a couple times a year (Tr. at 43).  Dr. Smith has recommended that plaintiff go see a surgeon (Tr. at 43).  Plaintiff does not yet have an appointment with a surgeon (Tr. at 44).

Plaintiff has very bad short-term memory (Tr. at 45). She forgets doctor appointments and when her medication needs to be filled (Tr. at 45). She has to write these things down or she will forget (Tr. at 45).  Plaintiff could not focus on a two-hour television program even if it were entertaining (Tr. at 46).  She could possibly focus for

an hour, but she could never concentrate for two hours at a time and she can't even sit and watch television for two hours (Tr. at 46).

Plaintiff is no longer able to vacuum or sweep (Tr. at 46).  Plaintiff can do things that do not require bending, such as dishes or laundry (Tr. at 46).  When plaintiff does these things or cleaning, she does them for 10 to 15 minutes at a time and then has to sit down and rest (Tr. at 47).

Dr. Smith told plaintiff not to lift more than a gallon of milk (Tr. at 47).  She believes she can lift up to 10 pounds occasionally which was defined as 1/3 of the day, but not frequently (Tr. at 47-48).  She could probably lift 5 pounds frequently (Tr. at 48).  Plaintiff can bend less than occasionally (Tr. at 48).  Reaching to the side would be a problem, but reaching in front of her is not (Tr. at 49).  She could reach occasionally but not frequently (Tr. at 49).  Plaintiff has very weak wrists from factory work (Tr. at 49).  She told Dr. Smith about her wrist weakness but she has not followed up further to see if there are any problems with them (Tr. at 49).  Plaintiff drops things a lot, and it is very very hard for her to open jars or use a can opener (Tr. at 50).

Plaintiff can sit for 30 minutes to an hour at the most (Tr. at 50-51).  Plaintiff does not do a lot walking due to shortness of breath and her back and knees (Tr. at 51).  Her doctor does not want her walking (Tr. at 51).

Change is very disturbing to plaintiff -- she has a structured and sheltered life (Tr. at 52).  She lives with her fiancé, her 20-year-old daughter, her 12-year-old daughter, and her pets (Tr. at 52).  She does not go to visit friends and relatives, and she does not have any meetings with social organizations (Tr. at 52).  She spends most of her

time at home reading, doing light housework and watching television (Tr. at 52).  She also sleeps during the day (Tr. at 53).  Plaintiff's daughter does the grocery shopping, but plaintiff goes about once a month (Tr. at 53).  Plaintiff can use an electric shopping cart when she goes to Wal-Mart so she can sit (Tr. at 53).

Plaintiff has social anxiety if there are a lot of people in the store (Tr. at 53-54).  She feels like she has to leave immediately no matter what (Tr. at 54).  Plaintiff has had this problem being around people for 6 or 7 years but it is far worse now (Tr. at 54).  Her social anxiety was not a problem for her in her past work because she got to work by herself (Tr. at 54).  Working with a supervisor is not a problem, only large groups of people cause a problem for her (Tr. at 55).  Plaintiff's pain is her biggest barrier to working (Tr. at 55).

Plaintiff gets bronchitis about twice a year which lasts for a week each time (Tr. at 55).  If that were her only problem, she would be able to work (Tr. at 56).  Plaintiff smokes a half a pack of cigarettes per day (Tr. at 56). She used to smoke two to three packs a day, so she is making progress on cutting down (Tr. at 56).

**2.**     **Vocational expert testimony.**

Vocational expert Steve Benjamin testified at the request of the Administrative Law Judge.  The first hypothetical involved a person who could lift 20 pounds occasionally and 10 pounds frequently; stand or walk for 2 hours per day; sit for 6 hours per day; occasionally stoop, kneel, crouch, or crawl; and should never climb (Tr. at 57-58).  The vocational expert testified that such a person could perform plaintiff's past relevant work as a small products assembler or a telephone solicitor (Tr. at 58).  The

person could also be a marker, with 28,830 in Missouri and 1,705,450 in the country; a sewing machine operator, with 4,620 in Missouri and 190,440 in the country; a polisher, with 1,470 in Missouri and 91,990 in the country; or a food and beverage order clerk, with 7,130 in Missouri and 264,500 in the country (Tr. at 58-59).

If one is performing unskilled work, the ability to concentrate for two hours at a time is not required since the work is repetitive (Tr. at 61). If plaintiff's testimony is found credible, she cannot work because she said she could only use her hands occasionally (Tr. at 62-63).

## V.    FINDINGS OF THE ALJ

Administrative Law Judge Alison Brookins entered her opinion on July 16, 2010 (Tr. at 12-20). Plaintiff's last insured date was December 31, 2012 (Tr. at 12, 14).

Step one. Plaintiff has not engaged in substantial gainful activity since her alleged onset date (Tr. at 14). Plaintiff worked after her alleged onset date but it did not amount to substantial gainful activity (Tr. at 14).

Step two. Plaintiff's severe impairments include degenerative arthritis in the bilateral knees and lumbar spine (Tr. at 14). Plaintiff's social phobia is non-severe (Tr. at 14-15).

Step three. Plaintiff's impairments do not meet or equal a listed impairment (Tr. at 15).

Step four. Plaintiff retains the residual functional capacity to lift and carry 20 pounds occasionally and 10 pounds frequently; sit for 8 hours per day and for 1 hour at a time; stand for 2 hours per day and for 1 hour at a time; walk for 2 hours per day and

1 hour at a time; has occasional postural and environment limitations and mild limitations in the ability to interact appropriately with the public, supervisors, and co-workers (Tr. at 15). With this residual functional capacity, plaintiff can return to her past relevant work as a telephone solicitor (Tr. at 19).

Step five. Alternatively, the ALJ found that plaintiff could work as a marker, mail clerk, stuffer or polisher, all jobs available in significant numbers (Tr. at 20).

## VI.    OPINION OF TREATING PHYSICIANS

Plaintiff argues that the ALJ erred in failing to give proper weight to the medical opinion of Kyle Smith, D.O., plaintiff's treating physician who completed a Medical Source Statement Mental and  Medical Source Statement Physical.

A treating physician's opinion is granted controlling weight when the opinion is not inconsistent with other substantial evidence in the record and the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques. Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005); Ellis v. Barnhart, 392 F.3d 988, 998 (8th Cir. 2005).  In determining the weight to give to a medical opinion, the ALJ considers a number of factors including the examining relationship, the length of the treating relationship, the frequency of examination, whether the opinion is supportable and consistent with the record as a whole, and whether the opinion is from a specialist about an issue related to that specialty. 20 C.F.R. §§ 404.1527(c) and 416.927(c). Under the regulations, treating physicians' opinions are generally entitled to greater weight than consultative opinions, which generally receive greater weight than opinions of non-examining physicians. 20 C.F.R. §§ 404.1527(c) and 416.927(c).

Although a treating physician's opinion concerning an applicant's functional limitations is generally entitled to substantial weight, it does not automatically control or obviate the need to evaluate the record as a whole. Brown v. Barnhart, 390 F.3d 535, 540 (8th Cir. 2004). Controlling weight may be given only in appropriate circumstances, and may not be given unless the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record. SSR 96-2p. An ALJ may discount or even disregard the opinion of a treating physician if other medical assessments are supported by better or more thorough medical evidence, or if a treating physician renders inconsistent opinions. Wildman v. Astrue, 596 F.3d 959, 964 (8th Cir. 2010).

The ALJ explained why he gave more weight to the opinions of Dr. Lutz and Dr. Ash than the opinions of Dr. Smith in his Medical Source Statements:

> As noted above, the undersigned has given significant weight to the consultative mental examination by Dr. Lutz. In regards to the examination by Dr. Ash, this is also given significant weight as he examined the claimant. His residual functional assessment is based on the claimant's reports and actual examination. Although Dr. Smith completed a physical residual functional assessment at the request of counsel in February 2009 reflecting significant limitations, these are not found in a review of his treatment notes therefore they cannot be given significant weight. From the alleged onset date to May 2008, the doctor noted that the claimant was doing well on medication. At the contact on May 23, 2008, the claimant reported only mild to moderate pain. She has not required regular treatment. The available evidence indicates that she remained fairly active with treatment notes in July 2008 indicating she had been riding rides at the fair. This is inconsistent Dr. Smith's assessment that she could do no climbing, stooping, kneeling, crouching, crawling, etc. There are no recent treatment records reflecting any significant concerns. The most recent MRI obtained at the time of Dr. Smith's residual functional assessment indicated only mild degenerative disease at L3-L4, mild bulge at L4-L5 with stability at L2-L3 and LS -SI. . . .

As for the opinion evidence, as noted above, the undersigned has given significant weight to the consultative examinations by Dr. Lutz and Dr. Ash as they provided extensive examinations. The assessment provided by treating source, Dr. Smith is given lesser weight because it is not supported in a review of his own treatment notes which indicate the claimant does fairly well. He had noted only mild to moderate pain which is inconsistent with his report that the claimant is significantly limited including no climbing, stooping, kneeling, crouching or crawling.

(Tr. at 18-19).

In this case, the ALJ found that Dr. Smith's opinions were not supported by his treatment records and other evidence of record. In February 2009, nearly nine months after he last treated plaintiff, Dr. Smith completed a medical source statement finding among other things that plaintiff could stand and/or walk less than 2 hours in an 8-hour workday and sit less than 6 hours in an 8-hour workday. He also stated that side effects of some of her pain medications affected her ability, although he did not elaborate on what ability was affected. Notably, there was no mention of side effects in any of Dr. Smith's treatment records except for October 18, 2009, and March 13, 2010 -- both denying any side effects from medication. On May 23, 2008, he indicated that plaintiff was taking her medication "without problems."

The record as a whole, including Dr. Smith's own treatment records, contradict his findings in the Medical Source Statements. In January 2007 he indicated that she was "doing quite well." In November 2007, plaintiff went to the emergency room for menstrual cramps and reported no muskuloskeletal complaints. Her back exam was normal; her extremities were normal. In January 2008 Dr. Smith noted that plaintiff said her back was doing well. In March 2008 he found no knee abnormalities on exam. In

December 2009 Dr. Smith noted that plaintiff's current treatment plan was effective. In January 2010, Dr. Ash observed that plaintiff was muscular and was moving about satisfactorily. In March 2010, Dr. Smith again noted that plaintiff's current treatment plan was effective. Because Dr. Smith's opinion in his Medical Source Statement contradicts all of the other evidence in the record, including his own treatment notes and plaintiff's own statements of her abilities, the ALJ properly gave it no weight.

With respect to her mental condition plaintiff stated in a Missouri Supplemental Questionnaire that she can watch a two-hour movie and her only difficulty is sitting for too long. She had no difficulty reading books, newspapers and magazines. She had no difficulty leaving her home, following instructions or getting along with others. Plaintiff's own report contradicts Dr. Smith's findings, i.e., that plaintiff was "markedly" limited in her ability to travel in unfamiliar places, in her ability to get along with coworkers or peers, and in her ability to interact appropriately with the general public, and that she was moderately limited in her ability to understand and remember even very short and simple instructions.

Dr. Smith's treatment records reflect one complaint of panic attacks and that was based on plaintiff's fiancé's impending incarceration.

In November 2007, Dr. Patterson found that plaintiff's entire psychological exam was normal. In July 2008 plaintiff was able to attend a fair, where presumably there were a lot of other people. In October 2008 she saw Dr. Wilson and reported no psychiatric symptoms. Her psychological exam on that date was normal. In December 2008 Dr. Kennetz found that plaintiff's entire psychological examination was normal. In

December 2009 -- less than a month after Dr. Smith found the extremely severe mental limitations listed in his Medical Source Statement Mental -- he noted in his own treatment record that plaintiff's anxiety was stable. That same month Dr. Lutz performed extensive psychological testing and determined that plaintiff had no difficulty understanding, remembering or carrying out instructions. She had only mild limitations in her ability to interact appropriately with the public, with supervisors, and with co-workers. She had no difficulty responding appropriately to usual work situations and to changes in a routine work setting. Dr. Lutz's opinion is consistent with the records of Dr. Patterson, Dr. Wilson, Dr. Kennetz, and Dr. Smith's treatment records, and it is consistent with plaintiff's daily activities which included the ability to attend a fair and her own statements in administrative paperwork that she had no difficulty with the things for which Dr. Smith found extreme limitations in his Medical Source Statement. Dr. Lutz is a mental health specialist; Dr. Smith is not. The ALJ properly gave more weight to the opinion of Dr. Lutz and no weight to the opinion of Dr. Smith.

## VII. CONCLUSIONS

Based on all of the above, I find that the ALJ did not err in determining plaintiff's credibility, her residual functional capacity, or her ability to perform substantial gainful activity. I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled. Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied.  It is further

ORDERED that the decision of the Commissioner is affirmed.


_/s/ Robert E. Larsen_
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
September 25, 2013